E-FILED
Monday, 04 May, 2020 01:34:56 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| DELOME OSTIAN JOHANNES FAVI, <br><br> Petitioner, <br><br> v. <br><br> CHAD KOLITWENZEW, <br><br> Respondent, <br><br> UNITED STATES OF AMERICA, <br><br> Interested Party. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )     Case No. 20-cv-2087 |

## <u>ORDER AND OPINION</u>

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court is Petitioner Delome Ostian Johannes Favi's Emergency Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and Complaint for Injunctive Relief (Doc. 1). On April 10, 2020, after initial briefing and a hearing, the Court ordered Petitioner released on bond. Now, after considering further briefing from the parties on the merits, the Court now GRANTS Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), and ORDERS his

continued release during the pendency of the COVID-19 pandemic.
Additionally, the Court ORDERS Petitioner's release beyond the
COVID-19 pandemic unless within 14 days of this order the
Government obtains an order from an Immigration Judge, who has
determined, after an individualized bond hearing, that Petitioner's
detention is necessary to prevent a risk of flight or a threat to public
safety.

## I.  BACKGROUND

### A. The COVID-19 Pandemic

By now the details of the global COVID-19 pandemic are well-
known to the parties and the general public.  While the first known
case of COVID-19 in the United States was only reported in late
January, the virus has spread exponentially and there are now over
1,122,486 known cases and over 65,735 known associated deaths
in the United States alone.  See Cases of Coronavirus Disease
(COVID-19) in the U.S., CDC,
https://www.cdc.gov/coronavirus/2019-ncov/cases-
updates/cases-in-us.html (last visited May 4, 2020); United States
Coronavirus Cases, Worldometers,

https://www.worldometers.info/coronavirus/country/us/ (last visited May 4, 2020).  In Illinois, there have been at least 61,449 positive cases and 2,618 deaths from COVID-19.  See Coronavirus Disease 2019 (COVID-19) in Illinois Test Results, Ill. Dep't of Pub. Health, https://www.dph.illinois.gov/covid19 (last visited May 4, 2020).  Kankakee County, where the Jerome Combs Detention Center is located, there have been at least 358 positive cases and 26 deaths.  Id.  On April 7, 2020, when this petition was filed, there were only 107 confirmed cases of COVID-19 and five associated deaths in Kankakee County.  Pet. at 8 (Doc. 1).

In response to COVID-19, the President of the United States declared a national state of emergency on March 13, 2020.  Illinois Governor JB Pritzker issued a disaster proclamation on March 9, 2020 regarding COVID-19 and has now extended a statewide stay-at-home order to May 30, 2020.  See Coronavirus Disease 2019 (COVID-19) in Illinois Test Results, Ill. Dep't of Pub. Health, https://www.dph.illinois.gov/covid19 (last visited May 4, 2020).  Additionally, Governor JB Pritzker has ordered every person over

the age of 2 years old to wear a face covering anytime they are
unable to maintain six feet from others.  Id.

COVID-19 is particularly dangerous due to how easily it
spreads, and the severity of the resulting illness.  The U.S. Center
for Disease Control (CDC) reports that COVID-19 appears to spread
from person-to-person, mainly through respiratory droplets
produced when an infected person coughs, sneezes, or talks.
Coronavirus Disease 2019 Basics (Apr. 22, 2020)
https://www.cdc.gov/coronavirus/2019-
ncov/faq.html#Coronavirus-Disease-2019-Basics (last visited May
4, 2020).  The virus spreads very easily through what is called
"community spread."  Id.  While infected individuals are thought to
be most contagious when they are showing symptoms, the virus
also appears to be spread by asymptomatic individuals.  Id.; see
also Transmission, CDC (Apr. 15, 2020),
https://www.cdc.gov/coronavirus/2019-
ncov/hcp/faq.html#Transmission (last visited May 4, 2020) ("The
onset and duration of viral shedding and the period of
infectiousness for COVID-19 are not yet known.").  "[T]hose who

contract the virus may be asymptomatic for days or even for the entire duration of the infection but can still transmit the virus to others, making it more challenging to readily identify infected individuals and respond with necessary precautions." Mays v. Dart, No. 20 C 2134, 2020 WL 1987007, at *2 (N.D. Ill. Apr. 27, 2020).

Symptoms of COVID-19 vary greatly between individuals. Symptoms generally appear two to fourteen days after exposure. Symptoms of Coronavirus, CDC (Mar. 20, 2020) https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited May 4, 2020). Some individuals appear to show no symptoms, while others individuals will develop cough, shortness of breath or difficulty breathing, fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, or a new loss of taste or smell. Id. In some individuals, however, the symptoms can result in serious illness or death. Id.

Recent clinical evidence indicates that in persons who suffer severe symptoms, the virus may also cause damage to organs such as the heart, the liver, and the kidneys, as well as to organ systems

such as the blood and immune systems.  This damage is so extensive and severe that it may be enduring.  Among other things, patients who suffer severe symptoms from COVID-19 end up having damage to the walls and air sacs of their lungs, leaving debris in the lungs and causing the walls of lung capillaries to thicken so that they are less able to transfer oxygen going forward.  Indeed, studies of some recovered patients in China and Hong Kong indicate a declined lung function of 20% to 30% after recovery.  Tianbing Wang, et al., Comorbidities and multi-organ injuries in the treatment of COVID-19, 395 Lancet 10228 (2020), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30558-4/fulltext; GW Hospital Uses Innovative VR Technology to Assess Its First COVID-19 Patient, Geo. Wash. Univ. Hosp., (Mar. 19, 2020), https://www.gwhospital.com/resources/podcasts/covid19-vr-technology (last visited May 4, 2020).

And, while anyone is at risk of serious illness or death from COVID-19, certain individuals with underlying medical risks face a significantly higher risk.  Particularly relevant for this case,

preliminary mortality rate analyses from a February 29, 2020 WHO-China Joint Mission Report indicated a mortality rate for individuals with hypertension at 8.4% and 8.0% for chronic respiratory disease.  Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Org., 12 (Feb. 29, 2020), https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-finalreport.pdf.

There is currently no cure and no vaccine for COVID-19.  The only way to prevent the virus is to prevent it from spreading.  In addition to frequent handwashing, the CDC recommends "social distancing" or "physical distancing" from others by maintaining a distance of at least 6 feet away from other people, avoiding gathering in groups, and staying out of crowded places.  Prevent Getting Sick, CDC (April 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 4, 2020).  Additionally, the CDC recommends face masks be worn at all times in settings where social distancing is not possible.  Id.

Congregate settings, such as detention centers, present
unique risks and challenges for controlling the spread of COVID-19.
See Interim Guidance on Management of Coronavirus Disease 2019
(COVID-19) in Correctional and Detention Facilities, CDC (Apr. 18,
2020), https://www.cdc.gov/coronavirus/2019-
ncov/community/correction-detention/guidance-correctional-
detention.html (last visited May 4, 2020).  See also, Castillo v. Barr,
No. CV2000605TJHAFMX, 2020 WL 1502864, at *5 (C.D. Cal. Mar.
27, 2020) ("[T]he Government cannot deny the fact that the risk of
infection in immigration detention facilities – and jails – is
particularly high if an asymptomatic guard, or other employee,
enters a facility.").  Maintaining social distancing is often not
possible in a detention center without drastic population reductions
where detainees inevitably share cells and common areas.

In neighboring Cook County, Illinois, the danger has already
manifested in a jail setting, with over 500 Cook County jail
detainees testing positive for COVID-19 and six detainee deaths, as
well as at least 300 corrections officers testing positive and one
corrections officer death. See 800 Sickened, 7 Dead: Inmates And

Guards Describe Life Inside Cook County Jail, WBEZ,

https://www.wbez.org/stories/cook-county-jail-coronavirus-

outbreak-personal-stories/df0d3e51-1232-493c-b24e-

a018d6ff2058 (last visited May 4, 2020); Mays v. Dart, No. 20 C

2134, 2020 WL 1987007, at *25 (N.D. Ill. Apr. 27, 2020) (addressing

a conditions of confinement claim brought by pre-trial detainees at

the Cook County Jail and the challenges of containing the virus in a

jail and ordering further injunctive relief). Many other jails and

detention centers have already seen dangerous outbreaks of

COVID-19 and the difficulty in containing its spread within a

facility. See, e.g., United States v. Scparta, No. 18-CR-578 (AJN),

2020 WL 1910481, at *1 (S.D.N.Y. Apr. 20, 2020) (discussing

outbreak of COVID-19 at FCI Butler); Chicago's Jail is Top U.S. Hot

Spot as Virus Spreads Behind Bars, NY Times, (Apr. 8, 2020),

https://www.nytimes.com/2020/04/08/us/coronavirus-cook-

county-jail-chicago.html (last visited Apr. 30, 2020) ("Concerns

about the virus's spread have prompted authorities across the

country to release thousands of inmates, many of whom were

awaiting trial or serving time for nonviolent crimes. But those

measures have not prevented a dizzying pace of infection among a population in which social distancing is virtually impossible and access to soap and water is not guaranteed.").

The CDC has published an extensive list of recommended steps for detention facilities to take and notes that "[b]ecause many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified.  Both good hygiene practices and social distancing are critical in preventing further transmission." See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, CDC (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited May 4, 2020).  Among other recommendations, the CDC recommends facilities implement social distancing strategies to increase physical space between detained persons to, ideally, six feet between all individuals.  Id.

**B. Jerome Combs Detention Center's Preventive Measures**

As the Government reports, Jerome Combs Detention Center
(JCDC), where Petitioner was being held has not yet had any
detainee or staff member test positive for COVID-19.  Resp.,
Declaration of Chad Kolitwenzew (Kolitwenzew Dec.), ¶ 9 (Doc. 20-
2).  Respondent Warden Kolitwenzew's Declaration outlines the
policies in place at JCDC, which he states have been in effect since
on or before March 9, 2020, and comply with the CDC's
recommendations.  These measures include screening detainees
and staff who enter the facility.  Kolitwenzew Dec. at ¶ 13(B).  The
last new ICE detainee entered JCDC on April 3, 2020.  Kolitwenzew
Dec. at ¶ 12(B)(1).  The screening includes taking the detainee's
temperature and other vitals and housing all detainees separately
from the general population for five to fourteen days.  Kolitwenzew
Dec. at ¶ 13(C).  While Respondent claims no detainee has
developed flu-like symptoms, if one did, he would be isolated in a
single cell.  Kolitwenzew Dec. at ¶ 13(B)(3).  Respondent also states
that "the JCDC staff has tested detainees for the presence of the
COVID-19 virus, and all tests have come back negative."

Kolitwenzew Dec. ¶ 9.  It is unclear what the circumstances were that led to the tests or how many detainees have been tested.

Respondent also states that JCDC has increased the frequency of sanitation procedures and has provided sanitation supplies to detainees.  Kolitwenzew Dec. at ¶ 13(D).  JCDC conducts a disinfection routine three times a day, which includes door handles, toilets, showers, and tables.  Id.  JCDC staff are also provided with soap, sanitizing supplies, and masks.  Id.  Respondent also states that JCDC has educated detainees regarding the best practices they can employ to lower their risk of exposure to COVID-19.  Id.

Respondent states that JCDC medical personnel wear masks and visit the ICE detainee housing unit twice a day to check on detainees for COVID-19 symptoms, including temperature checks of each detainee twice a day.  Kolitwenzew Dec. at ¶ 13(G).  Respondent also states that correctional staff visit the unit every 25 minutes and look for possible COVID-19 symptoms.  Id.

Respondent reports that while JCDC is a 450-bed facility, as of April 22, 2020, the total detainee population was only 344.

Kolitwenzew Dec. ¶ 3.  The ICE detainees are housed separately from other detainees, and there are currently 63 male ICE detainees.  Id.  Respondent did not state the capacity of the ICE detainee unit, but he states that, since March 19, 2020, 92 male ICE detainees have been released from JCDC and no new ICE detainees have entered since April 3, 2020.  Id.  ICE detainees are housed in two-person or four-person rooms with access to a shared living space.

Respondent reports food trays come into the common area of the ICE housing unit twice per day and detainees line up to receive their food tray.  Kolitwenzew Dec. at ¶ 8.  Respondent reports that JCDC staff wear gloves, a hair net, and face mask and verbally remind the detainees to maintain a distance of six feet from the detainee in front of them.  Id.  Detainees then have a choice of eating at communal tables or in their own cell.  Id.  Posters in English and Spanish have also been posted to remind detainees to remain six feet apart from others.  Id.  Additionally, no social or attorney visits are permitted, and group gatherings, such as classes

and religious events, have been cancelled.  Kolitwenzew Dec. at
¶ 13(A)(4).

Despite Respondent's declaration that these policies were
place as of March 9, 2020, Petitioner reports that, at least as of his
release on April 10, 2020, many of these measures were not
practiced.  Petitioner reports that detainees were still allowed to
play card games, checkers, and basketball together, JCDC were not
requiring that all staff wear gloves and masks at all times, detainees
had not been provided with prophylactic equipment including
masks, gloves, hand sanitizer, or sufficient cleaning supplies, and
they were not regularly sanitizing common areas and objects.  Pet.
Ex. A, Declaration of Delome Ostian Johannes Favi (Favi Dec.),
¶¶ 12-26 (Doc. 1-1).  Further, Petitioner reports that as of April 10,
2020, neither ICE nor JCDC was screening detainees for symptoms
other than temperature and was not quarantining individuals with
symptoms.  Id. at ¶¶ 13, 25-26.

## C. Petitioner's Health and Immigration History

Petitioner is 32 years old and a native of Benin.  He is married
to a U.S. citizen, with whom he has two young children: a one and a

half-year-old daughter and a five-month-old son.  See Favi Dec. at
¶ 5.  Petitioner and his wife are also the primary caretakers for his
five-year-old daughter from a previous relationship.  Id.  Petitioner
suffers from underlying medical conditions, including a history of
respiratory issues.  Id. at ¶ 8-9.  He contracted a severe case of
pneumonia in 2007, for which he received six months of inpatient
treatment.  Id.  He also has a chronic sinus condition that affects
his ability to breathe at night, and was recently informed he has
high blood pressure.  Id. at ¶ 10-11.

Petitioner entered the United States on February 27, 2013, on
a B-2 visitor's visa.  See Gov't Resp., Declaration of Deportation
Officer Landmeier (Landmeier Dec.), ¶ 6 (Doc. 20-1).  His visa
expired on August 26, 2013, but he remained in the United States.
Id.  On or about February 22, 2016, Petitioner was convicted of
corrupt business influence, a class 5 felony, in Hendricks County,
Indiana.  Id. at ¶ 7.  The court sentenced him to 1,460 days of
imprisonment.  Id.  After serving 384 days, the remainder of his
sentence was stayed.  Id.

On or about June 3, 2019, the United States Immigration and
Customs Enforcement (ICE), a division of DHS, took Petitioner into
custody.  Landmeier Dec. at ¶ 8.  He was served with a Notice to
Appear before an immigration judge, which commenced removal
proceedings.  Id.  The Notice to Appear charged Petitioner as
removable under INA § 237(a)(2)(A)(i) (or 8 U.S.C. § 1227(a)(2)(A)(i))
due to his commission of a crime involving moral turpitude within
five years of admission to the United States.  The Notice also
charged Petitioner as removable under INA § 237(a)(1)(B) (or 8
U.S.C. § 1227(a)(1)(B), as an alien present in the United States in
violation of the law, due to overstaying his visa.  See id.

Petitioner is subject to mandatory detention during his
removal proceedings pursuant to 8 U.S.C. § 1226(c) due to the
charge of removability under INA § 237(a)(2)(A)(i) (or 8 U.S.C.
§ 1227(a)(2)(A)(i)).  Accordingly, Petitioner had been detained since
his apprehension by ICE on June 3, 2019, and had been held at the
Jerome Combs Detention Center since June 7, 2019.  See Favi Dec.
at ¶ 4.

Petitioner's wife submitted a I-130 Petition for Alien Relative in August 8, 2019.  See Favi Dec. at ¶ 6; Pet. Reply, Ex. C., Declaration of David Faherty, ¶ 7 (Doc. 21-3).  If approved, Petitioner would be permitted to remain in the United States as a Lawful Permanent Resident.  While Petitioner is in removal proceedings, an I-130 Petition first must be approved by the United States Citizenship and Immigration Services (USCIS) before the Immigration Court can adjudicate his application for adjustment of status with a waiver of inadmissibility.  See Faherty Dec. at ¶ 12. Petitioner's attorney has requested, through the ICE Office of Chief Counsel, that USCIS expedite its review of the I-130 petition.  Id. at ¶ 7.  While USCIS had originally scheduled Petitioner's I-130 interview for March 23, 2020, he was informed on March 20, 2020 that it was cancelled due to the COVID-19 pandemic.  Id. at ¶ 12. It has not been rescheduled, nor has an estimate been given for when it might be rescheduled.

Due to his pending I-130 petition, Petitioner's removal proceedings have been continued.  On or about June 24, 2019, Petitioner appeared in immigration court for the first time and

requested that his case be continued so that he could obtain an
attorney.  Petitioner has since sought and obtained five additional
continuances.  Landmeier Dec. at ¶ 11-16.  As noted above, these
continuances were necessary because Petitioner's case cannot
proceed until USCIS processes Petitioner's I-130 petition and
conducts his interview.  See Faherty, Dec. at ¶ 12; Landmeier Dec.
at ¶ 13-16.

### D. Petitioner's Petition for Writ of Habeas Corpus

Petitioner filed this Emergency Petition for Writ of Habeas
Corpus pursuant to 28 U.S.C. § 2241 and Complaint for Injunctive
Relief (Doc. 1) on April 7, 2020.  At the time of filing, Petitioner was
detained under the authority of the U.S. Department of Homeland
Security (DHS) as a civil immigration detainee at the Jerome Combs
Detention Center in Kankakee, Illinois.  He argues that his
conditions of confinement during the COVID-19 pandemic, in light
of his underlying health conditions, violates his substantive due
process rights under the Fifth Amendment.  He also argues that his
prolonged nine-month detention without an individualized bond

hearing violates his procedural and substantive due process rights under the Fifth Amendment.

After a hearing on April 10, 2020, and after considering the initial briefs of the parties, this Court granted Petitioner release on bond pending a decision on the merits of his claim.  The parties have now filed additional briefing, and the case is ripe for a decision on the merits.

## II. DISCUSSION

Petitioner alleges he is entitled to release because, in light of his preexisting medical conditions and the COVID-19 pandemic, his conditions of confinement violate his substantive due process rights under the Fifth Amendment.  Additionally, Petitioner alleges that he is entitled to release because his detention without a bond hearing has become unconstitutionally prolonged, also in violation of the Due Process Clause of the Fifth Amendment.  The Government challenges the Court's habeas jurisdiction as well as the merits of Petitioner's claims.  However, for the reasons below, the Court finds that the Court has habeas corpus jurisdiction under 28 U.S.C.

§ 2241 to consider Petitioner's claims and that Petitioner's claims succeed on the merits.

As an initial matter, the parties disagree as to whether the Court's analysis should be conducted in terms of a decision on the merits of Petitioner's habeas case or as a preliminary injunction.  As Petitioner points out, the Court's original understanding was, after additional briefing, that the Court would be prepared to rule on the merits of Petitioner's habeas petition.  See April 13, 2020 Text Order.  Unlike similar cases in other courts, Petitioner has not framed his challenge as a request for a preliminary injunction. Compare Pet. (Doc. 1), with, e.g., Thakker v. Doll, No. 1:20-CV-480, 2020 WL 1671563, at *1 (M.D. Pa. Mar. 31, 2020).  Further, as the Court finds its authority to release Petitioner is rooted in habeas corpus, the Court elects to reach a final decision on the merits of Petitioner's habeas claim.  Moreover, the Court notes that the distinction is largely unimportant here, as habeas relief is, in essence, a form of injunctive relief.  Accordingly, the Government's concerns and arguments raised in the context of a preliminary

injunction are fully encompassed in the Court's analysis on the merits of Petitioner's Habeas Corpus Petition.

## A. Petitioner's Claims Are Properly Raised in a Habeas Corpus Petition.

A federal court may grant the writ of habeas corpus if a detainee "is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(a), (c)(3); see INS v. St. Cyr, 533 U.S. 289, 305 (2001).  A petition seeking habeas corpus relief is appropriate under 28 U.S.C. § 2241 when a petitioner is challenging the fact or duration of his confinement.  Preiser v. Rodriguez, 411 U.S. 475, 490, 93 S.Ct. 1827 (1973); Waletzki v. Keohane, 13 F.3d 1079, 1080 (7th Cir. 1994).  Habeas corpus has been recognized as an appropriate vehicle through which noncitizens may challenge the fact of their civil immigration detention.  See Zadvydas v. Davis, 533 U.S. 678, 688 (2001); see generally Jennings v. Rodriguez, 138 S. Ct. 830 (2018).

The Government argues that Petitioner's conditions of confinement claim and failure to provide adequate medical care

claim cannot be addressed in a habeas corpus petition because the proper remedy is not release, but a judicially mandated change in conditions.  Indeed, in most circumstances, the Seventh Circuit has found that a claim of unconstitutional conditions of confinement or failure to provide medical treatment would not entitle a Petitioner to release.  See, e.g., Robinson v. Sherrod, 631 F.3d 839, 840-841 (7th Cir. 2011) (recognizing the "long-standing view that habeas corpus is not a permissible route for challenging prison conditions" that do not bear on the duration of confinement); Glaus v. Anderson, 408 F.3d 382, 387 (7th Cir. 2005) (concluding that because "release from custody is not an option" for a claim that alleges that "medical treatment amounts to cruel and unusual punishment" in violation of the Eighth Amendment, it cannot be addressed in habeas).

However, the Seventh Circuit has also recognized that "the Supreme Court [has] left the door open a crack for prisoners to use habeas corpus to challenge a condition of confinement."  Robinson v. Sherrod, 631 F.3d 839, 840 (7th Cir. 2011) (internal quotation marks and citations omitted); see also Aamer v. Obama, 742 F.3d 1023, 1032 (D.C. Cir. 2014) (a prisoner may challenge the

conditions of his confinement in a federal habeas corpus petition);
Thompson v. Choinski, 525 F.3d 205, 209 (2d Cir. 2008) (same).

Courts across the country addressing similar claims of civil immigration detainees during the COVID-19 pandemic have found that such a claim can proceed in a habeas corpus petition.  See, e.g., Hernandez v. Kolitwenzew, Case No. 2:20-cv-2088-SLD, Order, d/e 12 (C.D.Ill. Apr. 23, 2020) ("While a "run-of-the-mill" condition of confinement claim may not touch upon the fact or duration of confinement, here, Petitioner is seeking immediate release based upon the claim that there are essentially no conditions of confinement that are constitutionally sufficient given the facts of the case."); Engelund v. Doll, No. 4:20-CV-00604, 2020 WL 1974389, at *7 (M.D. Pa. Apr. 24, 2020); Coreas v. Bounds, No. CV TDC-20-0780, 2020 WL 1663133 (D. Md. Apr. 3, 2020); Thakker, et. al, v. Doll, No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020).  But see Dawson v. Asher, No. 20-409, 2020 WL 1304557, at *2 (W.D. Wash. Mar. 19, 2020) (declining to address whether the court had habeas jurisdiction, but noting that "even if Plaintiffs could show a Fifth Amendment violation, Plaintiffs provide

no authority under which such a violation would justify immediate release, as opposed to injunctive relief that would leave Plaintiffs detained while ameliorating any alleged violative conditions within the facility."). <u>See</u> <u>also</u>, Pet. Reply at 5 (Doc. 21) (listing numerous similar cases where civil immigration detainee petitioners have been ordered released when bringing conditions of confinement claims related to their underlying medical conditions and the COVID-19 pandemic).

Here, the Court finds that Petitioner's conditions-of-confinement claim directly bears on not just his conditions of confinement, but whether the <u>fact</u> of his confinement is constitutional in light of the conditions caused by the COVID-19 pandemic.  Accordingly, the Court finds that his claim can proceed in a habeas corpus petition and the Court proceeds to a determination of the merits.

**B. The Due Process Clause of the Fifth Amendment Requires that Petitioner be Granted an Individualized Bond Hearing Due to his Prolonged Detention.**

The Court begins with addressing Petitioner's prolonged detention claim, which is, in many regards, a more straightforward request for habeas relief.  Petitioner argues that his prolonged detention of nine months without an individualized bond hearing violates his Due Process rights under the Fifth Amendment. Petitioner is being detained pursuant to 8 U.S.C. § 1226(c), which mandates an alien's detention during their immigration proceedings if they have been convicted of certain crimes.

As discussed above, it is well-established that federal courts have jurisdiction to review the constitutionality of a non-citizen's detention under § 1226(c).  See, Jennings v. Rodriguez, 138 S. Ct. 830, 841 (2018); Demore v. Kim, 538 U.S. 510, 517, 123 S. Ct. 1708, 1714 (2003).  It is also "well established" that non-citizens in removal proceedings are entitled to the protections of the Fifth Amendment.  See Kim, 538 U.S. at 523.  In evaluating a due process claim, the Court "is required to evaluate the private

interest, the probability of error (and the effect of additional safeguards on the rate of error), and the government's interest in dispensing with those safeguards, with a thumb on the scale in favor of the statute's constitutionality." Parra v. Perryman, 172 F.3d 954, 958 (7th Cir. 1999) (citing Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, (1976)).

The Supreme Court, in analyzing the post-removal order detention statute, 8 U.S.C. § 1231, has held that indefinite detention of a non-citizen would violate the Fifth Amendment's Due Process Clause.  Zadvydas v. Davis, 533 U.S. 678, 690 (2001) (holding that after a six-month presumptively reasonable period, a non-citizen's detention under the post-removal statute could only continue if there was a "significant likelihood of removal in the reasonably foreseeable future").  However, in Demore v. Kim, 538 U.S. 510 (2003), the Supreme Court rejected a facial challenge to the constitutionality of § 1226(c), finding that indefinite detention was not authorized under the statute because the detention has a "definite termination point," when the removal proceedings conclude.  Id. at 529.  In Kim, the Supreme Court found that,

unlike the statute in <u>Zadvydas</u>, the detention authorized under

§ 1226(c) was of a much shorter duration because in the majority of

cases a removal proceeding takes less than 90 days and, if the

removal order is appealed, would still only take an average of four

months longer.  <u>Id.</u>  However, Justice Kennedy's concurrence in

<u>Kim</u> suggested that a non-citizen detained under § 1226(c) would

still be "entitled to an individualized determination as to his risk of

flight and dangerousness if the continued detention became

unreasonable or unjustified."  <u>Id</u>. at 532 (Kennedy, J., concurring).

Recently, in <u>Jennings v. Rodriguez</u>, 138 S. Ct. 830 (2018), the

Supreme Court again addressed a challenge to § 1226(c) and held

that an implicit "reasonableness" limitation of six-months before

providing a bond hearing could not be plausibly read into the

statute under the canon of constitutional avoidance.  <u>Id</u>. at 847

(noting the differences between the language of §§ 1226(c) and

1231, in which the Supreme Court in <u>Zadvydas</u> did read an implicit

reasonableness limitation).  As <u>Jennings</u> noted, § 1226(c) "does not

on its face limit the length of the detention it authorizes," as it only

ends when immigration proceedings have been concluded and the

non-citizen is either released or removed.  Id. at 846.  Jennings,

however, did not address the constitutional question, remanding

that question to the Ninth Circuit.  Id. at 851.

While the Government argues that Petitioner's claim must be

denied in light of Jennings and Kim, as suggested by Justice

Kennedy's concurrence in Kim, the Court finds that both of these

cases have left open individualized challenges to a non-citizen's

detention under § 1226(c).  Since Jennings, district courts in the

Seventh Circuit and around the country have granted habeas relief

to petitioners detained under § 1226(c) after considering case-

specific factors, including the overall length of the detention, the

reason for the delay, the likelihood of eventual removal, the likely

duration of future detention, and the conditions of detention, and

balanced them against the Government's legitimate interest in

detention.  See, e.g., Parzych v. Prim, No. 19 C 50255, 2020 WL

996559, at *3 (N.D. Ill. Mar. 2, 2020) (granting habeas relief to

individual detained for "three years without any obvious

termination point of his removal proceedings"); Baez-Sanchez v.

Kolitwenzew, 360 F. Supp. 3d 808, 815-16 (C.D. Ill. 2018) (granting

habeas relief for individual detained for over four-years without an individualized bond hearing who had a "good-faith belief that he would not ultimately be removed" due to his pending visa petition); Hernandez v. Decker, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *10 (S.D.N.Y. July 25, 2018) (collecting cases).  See also Vargas v. Beth, 378 F. Supp. 3d 716, 727 (E.D. Wis. 2019), appeal dismissed, No. 19-1965, 2019 WL 6133750 (7th Cir. July 18, 2019) (denying habeas relief on the merits where petitioner had no defense to his removal, but collecting factors courts have used to evaluate the reasonableness of detention).

Here, the Court concludes that Petitioner's detention has become unreasonably prolonged and the Due Process Clause of the Fifth Amendment requires an individualized bond hearing. Petitioner's overall detention has been nine months so far—significantly longer than the 90-day average assumed in Kim.  See also Hernandez v. Decker, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *1 (S.D.N.Y. July 25, 2018) (finding nine-month detention unreasonably prolonged); Misquitta v. Warden Pine Prairie ICE Processing Ctr., 353 F. Supp. 3d 518, 527 (W.D. La.

2018) (finding ten-month detention unreasonably prolonged).  The
Government seeks to blame Petitioner for the delay in adjudicating
his case, citing to Petitioner's six requests for continuances.
However, the delays are ultimately due to USCIS's processing times
for Petitioner's I-130 Petition, not due to any desire by Petitioner to
"postpone[e] inevitable deportation," or to try to "game the system."
Baez-Sanchez v. Kolitwenzew, 360 F. Supp. 3d 808, 816 (C.D. Ill.
2018).  Moreover, the Court does not find this case similar to Torres
v. Schmidt, Case No. 19-cv-929, 2019 WL 3574929 (E.D. Wis. Aug.
6, 2019), as the Government argues, where the continuances were
due to the petitioner's need to prepare his case.  Id. at *4.

Moreover, Petitioner's ultimate removal appears unlikely in
light of his viable immigration claims, which the Government has
not disputed.  Despite the fact that his ultimate removal is unlikely,
without habeas relief, Petitioner's detention under § 1226(c) would
likely continue, essentially, indefinitely.  USCIS cancelled
Petitioner's previously scheduled March 23, 2020, I-130 interview.
The Government has provided no timeline of when USCIS will begin
adjudicating visa petitions, and it seems unlikely it will resume

doing so during the COVID-19 pandemic.  Finally, the conditions of Petitioner's confinement in a jail-like setting have become significantly more problematic during the COVID-19 pandemic.

While "[t]he Court recognizes that the Government has a valid interest in requiring detention during removal hearings to ensure that removable aliens appear for their removal hearings, the additional safeguard of a bond hearing to make an individualized determination as to [Petitioner's] flight risk and dangerousness would not impede this purpose." Baez-Sanchez, 360 F. Supp. 3d at 816 (C.D. Ill. 2018).  In light of the totality of the circumstances, the Court finds that Petitioner's continued detention without an individualized bond hearing has become unreasonable, and due process now requires an individualized bond hearing in which the Government must prove by clear and convincing evidence that Petitioner's continued detention is justified based on his flight risk or danger to the community.

Absent the COVID-19 pandemic the Court would be unlikely to order release prior to giving the Government an opportunity to conduct an individualized bond hearing in Petitioner's removal

proceedings.  However, given the substantial risk involved by
continuing to detain Petitioner during the COVID-19 pandemic, and
the Government's lack of any meaningful argument regarding
Petitioner's dangerousness or flight risk, the Court finds that
Petitioner's continued release is appropriate.  However, Petitioner's
release on this claim would no longer be authorized if, within 14
days of this order, an immigration judge holds a bond hearing and
enters an order finding that Petitioner's continued detention is
necessary to prevent a risk of flight or a threat to public safety.

## C. Petitioner's Conditions of Confinement Violate His Fifth Amendment Due Process Rights.

The emergency nature of Petitioner's Petition stems from his
conditions of confinement claim.  Petitioner challenges the
conditions of his confinement, arguing, in light of the COVID-19
pandemic, his underlying health conditions, and JCDC's
insufficient measures to prevent the spread of COVID-19, that he is
entitled to release.  Petitioner, as a civil immigration detainee,
brings his claim under the Due Process Clause of the Fifth
Amendment.  The Seventh Circuit has recently clarified that a

conditions of confinement claim based on due process is analyzed

under the objective inquiry standard announced in <u>Kingsley v.</u>

<u>Hendrickson</u>, 576 U.S. 389 (2015).  <u>Hardeman v. Curran</u>, 933 F.3d

816 (7th Cir. 2019).  While <u>Hardeman</u> addressed a conditions-of-

confinement claim for pretrial detainees under the Fourteenth

Amendment, the same standards apply to federal civil immigration

detainees bringing claims under the Fifth Amendment.  <u>See</u>, <u>e.g.,</u>

<u>Belbachir v. Cty. of McHenry</u>, 726 F.3d 975, 979 (7th Cir. 2013)

(applying same standards to civil immigration detainee as to pretrial

detainee).

To prevail on a conditions of confinement claim, Petitioner

must prove "(1) the conditions in question are or were objectively

serious (or if the claim is for inadequate medical care, his medical

condition is or was objectively serious); (2) the defendant acted

purposefully, knowingly, or recklessly with respect to the

consequences of his actions; and (3) the defendant's actions were

objectively unreasonable—that is, "not rationally related to a

legitimate governmental objective or ... excessive in relation to that

purpose."  <u>Hardeman</u>, 933 F.3d at 827 (Sykes, J., concurring)

(quoting <u>Kingsley</u>, 135 S. Ct. at 2473–74).  The third requirement is

rooted in the Supreme Court's decision in <u>Bell v. Wolfish</u>, 441 U.S.

520 (1979), where the Supreme Court instructed that, in

determining whether "particular restrictions and conditions

accompanying pretrial detention amount to punishment," courts

"must decide whether the disability is imposed for the purpose of

punishment or whether it is but an incident of some other

legitimate governmental purpose."  <u>Id</u>. at 538.  <u>Kinglsey</u> clarified

that "[i]n the absence of an expressed intent to punish, a pretrial

detainee can nevertheless prevail by showing that the actions are

not 'rationally related to a legitimate nonpunitive governmental

purpose' or that the actions 'appear excessive in relation to that

purpose.' " <u>Kingsley</u>, 135 S. Ct. at 2473 (quoting <u>Bell</u>, 441 U.S. at

561, 99 S.Ct. 1861).

With regards to the first requirement, it cannot be disputed

that the conditions involved are sufficiently serious.  <u>See also</u> <u>Mays</u>

<u>v. Dart</u>, No. 20 C 2134, 2020 WL 1987007, at *23 (N.D. Ill. Apr. 27,

2020) (finding that there is "no question that the plaintiffs' claims

involve conditions that are sufficiently serious to invoke the

Fourteenth Amendment"). The COVID-19 pandemic has infected

over a million people and claimed over 60,000 lives in the United

States alone. The situation at the Cook County Jail and others

across the country has shown just how rapidly this virus can

spread in a jail-like setting. For individuals like Petitioner, with a

heightened risk of serious illness or death from COVID-19, there

can be no doubt that the conditions are objectively serious. Nor

does the second requirement appear to be in dispute. The

Government and JCDC have not disputed that they are aware of the

serious risks related to the COVID-19 pandemic or that they are

aware of Petitioner's heightened risk due to his underlying health

conditions.

The parties dispute centers around the third requirement—

whether the Government's actions are objectively unreasonable.

The Government has a legitimate nonpunitive interest in detaining

individuals like Petitioner pending the execution of a valid removal

order against them. See Demore, 538 U.S. at 528; Zadvydas, 533

U.S. at 690. The Government first appears to argue that a

communicable disease outbreak simply cannot override the

Government's legitimate detention interests in civil immigration detention, relying on Dawson v. Asher, No. 20-409, 2020 WL 1304557 (W.D. Wash. Mar. 19, 2020).  However, that there is a legitimate nonpunitive interest in detaining Petitioner does not mean that this interest is never outweighed by a Petitioner's constitutional rights under the due process clause.  Rather, the Court must consider Petitioner's conditions of confinement created by the COVID-19 and the Government's response in relation to the Government's interests in detaining the Petitioner.

The Government also, however, argues that Petitioner cannot show that there is an objectively unreasonable risk of harm because JCDC has taken reasonable steps to protect the detainees from COVID-19.  As detailed above and in Warden Kolitwzew's declaration, JCDC has implemented a number of policies to prevent the introduction and spread of COVID-19.  The Government places great weight on its claim that it has largely implemented all of the guidance from the CDC.  However, as other courts have found, the CDC's guidelines, while important, are not dispositive standing alone.  Mays, 2020 WL 1987007, at *27; Malam v. Adducci, No. 20-

10829, 2020 WL 1899570, at *4 (E.D. Mich. Apr. 17, 2020)
(addressing limits of CDC guidance and noting that they only make
recommendations for precautionary measures but [do] not assess
the resulting risk of COVID-19 infection once those measures have
been implemented.").

Moreover, as Petitioner points out, it is not clear that JCDC's
policies are in line with the CDC's guidance. And, Petitioner
disputes that the majority of these policies were actually practiced
at JCDC, at least as of Petitioner's release on April 10, 2020.
Regardless, the Court finds that JCDC measures are insufficient to
minimize Petitioner's risk of harm given the Government's limited
continued interest in Petitioner's detention.

As to spread, notably, the detention center is not at capacity—
although the capacity of the ICE detainee unit in relation to the jail
was not provided. However, while the Court presumes the jail is
below normal capacity, "the appropriate capacity of a jail during a
pandemic obviously differs enormously from its appropriate
capacity under ordinary circumstances." Basank v. Decker, No. 20
CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020).

The facility has also increased sanitation measures and "encouraged" social distancing.  Despite the actions taken by JCDC, Petitioner argues that social distancing is still not possible within the facility and disputes that any increased sanitation measures were in place prior to April 10, 2020.  Warden Kolitwenzew's declaration concedes that detainees share sleeping spaces and have access to a shared living space.  The Government argues that "[t]he CDC's guidance for detention facilities such as the JCDC acknowledges that social distancing can be pursued by a variety of strategies short of establishing and maintaining complete individual isolation."  Gov't Resp. at 24 (Doc. 20).  While individual isolation may not be needed, the Government makes no attempt to argue that JCDC is actually enforcing CDC-recommended social distancing beyond merely posting signs and reminding detainees of distancing only while lined up for meals.  Such a policy is likely particularly ineffective given the language barriers of ICE detainees.  Moreover, detainees have continued to participate in many communal activities, including basketball and cards.  Given the lack of meaningful ability to social distance, should any staff

member or detainee contract COVID-19, it would likely be only a matter of time before the virus would spread.

The Government also importantly points out that there are no known cases of COVID-19 in the facility. However, many other courts have found that release was still appropriate despite there being no evidence of COVID-19 in the facilities in light the individual petitioner's health conditions and inadequate precautions taken at the facility to prevent potential introduction and spread of COVID-19. See, e.g., Fofana v. Albence, No. 20-10869, 2020 WL 1873307, at *9 (E.D. Mich. Apr. 15, 2020) (releasing ICE detainee with underlying medical conditions placing him at high risk); Malam v. Adducci, No. 20-10829, 2020 WL 1899570, at *3 (E.D. Mich. Apr. 17, 2020) (rejecting Respondent's argument that "that until there is a confirmed case of COVID-19, or perhaps an outbreak of the illness it causes, in the Calhoun County Correctional Facility, Petitioner cannot show that COVID-19 poses an unreasonable risk of infection" as "fly[ing] in the face of public health experts"). Moreover, a lack of COVID-19 cases only matters if there are sufficient measures in place to prevent it from

entering—as it is unquestionably spreading in Illinois and
Kankakee County.  JCDC states that it has not allowed new
detainees to enter since April 3, 2020.  However, it also appears
from Warden Kolitwenzew's declaration that detainees still must go
back and forth for immigration court appearances.  While detainees
may be given a mask during transport, it is not clear that use of the
mask is mandated or that it is the type of mask, such as a N95,
that would prevent a detainee from getting the virus, as opposed to
preventing them from spreading it.  Staff, too, obviously must enter
and exit JCDC—each time potentially bringing the virus into the
JCDC.  Again, while the evidence shows that staff have access to
masks, there is no evidence showing they are required to wear
them.

JCDC has also established screening measures for both staff
and detainees.  Screening, however, will only allow the facility to
identify individuals with active symptoms, not those asymptomatic
individuals who can nevertheless spread the virus undetected.  The
Government's response does not address the potential for
asymptomatic spread and JCDC does not appear to be mandating

use of masks by its staff or detainees that would help to contain any asymptomatic spread.  The Government indicates that some testing has been done, but does not indicate the scope of testing, or why certain individuals were tested.

The Government also argues, within the context of standing, that Petitioner's claim cannot proceed because he has not alleged a cognizable injury.  As the Supreme Court has made clear, however, a petitioner need not wait until he is actually injured in order to obtain preventive relief.  Helling v. McKinney, 509 U.S. 25, 33 (1993).  "It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  Id.  The risk of exposure to COVID-19 constitutes exactly the type of "unsafe, life-threatening condition" that "need not await a tragic event" in order to be remedied.  Id. at 33-34.  And, here, unlike the toxin at issue in Helling, any exposure to COVID-19 would present Petitioner with a substantial risk of serious illness or death.  See also, Bent v. Barr, No. 19-CV-06123-DMR, 2020 WL 1812850, at *3 (N.D. Cal. Apr. 9, 2020) ("Given the exponential spread of the virus,

the ability of COVID-19 to spread through asymptomatic individuals, and the inevitable delays of court proceedings, effective relief for Bent and other detainees may not be possible if they are forced to wait until their particular facility records a confirmed case."); United States v. Kennedy, 2020 WL 1493481, at *5 (E.D. Mich. Mar. 27, 2020) ("[W]aiting for either Defendant to have a confirmed case of COVID-19, or for there to be a major outbreak in Defendant's facility, would render meaningless this request for release."); Thakker, 2020 WL 1671563, at *2 ("Respondents would have us offer no substantial relief to Petitioners until the pandemic erupts in our prisons. We reject this notion.").

The Government also argues that Petitioner has a risk of contracting COVID-19 out in the community as well, making his release not likely to reduce his potential exposure to the virus. However, the Court disagrees.  Petitioner's risk is obviously substantially reduced when Petitioner is in control of social distancing and other preventative measures, rather than relying on the voluntary actions of dozens of fellow detainees and detention staff to take preventative measures.  See Coreas v. Bounds, No. CV

TDC-20-0780, 2020 WL 1663133, at *6 (D. Md. Apr. 3, 2020)

(relying on expert opinions to conclude that it was implausible to

claim "someone will be safer from a contagious disease while

confined in close quarters with dozens of other detainees and staff

than while at liberty").

Furthermore, while for most individuals, JCDC's measures

would likely be more than sufficient to survive a due process

challenge, Petitioner's unique medical conditions place him at an

increased risk or serious illness or death.  Moreover, as explained

above, the Government's legitimate interest in detaining Petitioner

is already greatly diminished absent a showing that he is a danger

to the community or a flight risk—which the Government has not

plausibly made at this time.  While the Court agrees Petitioner has

not shown that the Government has any express intent to punish

him, the Court finds that, considering the totality of the

circumstances, Petitioner's detention appears "excessive in relation

to" the Government's "legitimate nonpunitive governmental

purpose" for detaining him.  Kingsley, 135 S. Ct. at 2473

(quoting Bell, 441 U.S. at 561, 99 S.Ct. 1861).  Petitioner's

continued detention under these conditions is not objectively
reasonable nor is it logically related to the Government's interest in
ensuring Petitioner's presence at his removal hearing when there
are "a plethora of means other than physical detention at [the
Government's] disposal by which they may monitor civil detainees
and ensure that they are present at removal proceedings, including
remote monitoring and routine check-ins." Thakker, et. al, v. Doll,
No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); see
also Fraihat, 2020 WL 1932570 at *26 ("[A]ttendance at hearings
cannot be secured reliably when the detainee has, is at risk of
having, or is at risk of infecting court staff with a deadly infectious
disease with no known cure. Participation in immigration
proceedings is not possible for those who are sick or dying, and is
impossible for those who are dead."); Malam v. Adducci, No. 20-
10829, 2020 WL 1899570, at *6 (E.D. Mich. Apr. 17, 2020) (noting
that, unlike the other habeas cases, the Government "has
additional precautionary measures at [its] disposal: the release of
Petitioner," and noting that "ICE has released other detainees due
to the risks of COVID-19").  Accordingly, the Court finds that

Petitioner is entitled to relief on his conditions of confinement claim until the risks of the COVID-19 pandemic subside.

### III. CONCLUSION

For the reasons states above, Petitioner Delome Ostian Johannes Favi's Emergency Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 and Complaint for Injunctive Relief (Doc. 1) is GRANTED.

The Court ORDERS Petitioner's continued release pursuant to the Court's previous conditions of bond until the risk of the COVID-19 pandemic subsides.  Further, the Court ORDERS Petitioner's continued release beyond the time that the risk of the COVID-19 pandemic subsides unless, within 14 days of this order, an Immigration Judge determines, after an individualized bond hearing in which the Government bears the burden of proof by clear and convincing evidence, that Petitioner's continued detention is necessary to prevent a risk of flight or a threat to public safety. Pursuant to the Government's request, the Parties are ORDERED to provide this Court with a status update in 21 days informing the Court whether further Court involvement will be needed regarding

Petitioner's continued release during the COVID-19 pandemic.  Any

further injunctive relief requested by Petitioner in his Petition is

denied at this time.


ENTER: May 4, 2020

*/s/ Sue E. Myerscough*
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE